8      **UNITED STATES DISTRICT COURT**

9      **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| UNITED STATES, | CASE NO. 11-cr-5726-L |
| Plaintiff, | ORDER DENYING MOTIONS TO SUPPRESS EVIDENCE AND TO SUPPRESS STATEMENTS |
| vs. | |
| MOHAMMAD REZA NAZEMZADEH, | [Doc. 51.] |
| Defendant. | |

Defendant Mohammad Reza Nazemzadeh ("Defendant" or "Nazemzadeh") was charged via indictment with Obstruction of Justice, in violation of 18 U.S.C. § 1512(b)(3). Later, on October 18, 2012, a grand jury returned a superceding indictment adding the additional charges of Conspiracy to Export to Embargoed County, in violation of 50 U.S.C. §§ 1702 & 1705; Conspiracy to Smuggle Goods from the United States, in violation of 18 U.S.C. § 371 & 554; and Money Laundering, in violation of 18 U.S.C. § 1956(a)(2).

On October 10, 2012, Defendant filed a motion to suppress evidence and suppress statements. On November 8, 2012, the Court held a hearing on the motions. For the following reasons, Defendant's Motions to Suppress Evidence and Suppress Statements will be denied.

**I.      FACTUAL BACKGROUND**

Mohamad Nazemzadeh was born in Iran but now lives in the United States on an H1B employment visa. He is currently employed as a post doctoral research fellow in the Department of

Radiology Oncology at the University of Michigan in Ann Arbor, Michigan. According to Defendant his work has received nationwide recognition in the field of radiation therapy in cancer treatment in several peer-reviewed journals and conferences. One of his discoveries has been recognized as a significant development in cancer treatment and, as a result, he was invited to present his work at the annual meeting of the American Association of Physics in Medicine (AAPM) 2012. He applied to be a lawful permanent resident but his petition was subsequently denied. Nazemzadeh has filed a motion to reconsider the immigration case. That motion remains pending.

Agents began investigating Nazemzadeh when an employee ("source") at Soundimaging, a San Diego-based company provided information that an individual was attempting to procure medical equipment for shipment to Iran in violation of U.S. export laws.[1] Nazemzadeh first came to the attention of the source when, in November of 2010, he submitted an electronic pricing request for eight MRI coils to Soundimaging. Nazemzadeh said that he represented an Iranian company and that the coils were for export to Iran. According to the Government's brief, the transaction hit a snag when the shipper, TNT, said that it would not ship the coils to Iran. Nazemzadeh then suggested shipping the coils to a Dutch company, but complained in an email that "if we have to ship the coil through [the] Netherlands, it would be much more expensive for us and we should pay that company as well [sic]." In February 2011, Nazemzadeh abandoned the transaction.

On August 12, 2011, Nazemzadeh again contacted the source at Soundimaging by email, this time to ask about the price and availability of an 8-channel HD MRI brain array coil. This is when the source contacted the Department of Homeland Security Investigations ("HSI") about Nazemzadeh's request and forwarded Nazemzadeh's email correspondence with the company to HSI. On August 15, 2011, an HSI undercover agent ("UCA") posing as a sales representative of Soundimaging contacted Defendant by email, and the next day, by phone. The UCA recorded that phone conversation as well as four later conversations. The Court has reviewed the recordings of these conversations as well as copies of email correspondence between the UCA and Nazemzadeh. The "CC" (courtesy copy) field of various of these emails indicated additional parties to the

---

[1] The factual background is taken from the Reports of Investigation ("ROI") as well as from the briefs provided by Nazemzadeh and the Government.

transaction: Kayvan Hashemi, and Moshen Hamayoun.

The correspondence all centers around the purchase of MRI parts for shipment to Iran by using Hospital Equipment Service BV ("HES"), in the Netherlands as an intermediary. Nazemzadeh discussed the possibility of obtaining a license for the transaction but declined to do so. On August 18, 2011, the UCA emailed Nazemzadeh a price quote for the MRI coil and Nazemzadeh replied that HES would wire the money. A few days later, an employee of HES emailed the UCA a copy of the wire transfer from the Netherlands to the undercover account in San Diego. The employee included Nazemzadeh and Hashemi in the CC field. After the wire cleared, the UCA emailed Nazemzadeh and Hashemi, informing them the transfer had cleared and provided a dummy tracking number for the coil, which never shipped.

After realizing the coil was delayed, HES contacted Hashemi regarding the missing coil. The next day, the UCA received an email in Farsi from Hamayoun and forwarded it to Nazemzadeh, who replied that it had been sent to the UCA by mistake. Nazemzadeh also reminded the UCA that he did not purchase the coil. Rather, Nazemzadeh stated HES had purchased it directly from Soundimaging. The UCA later informed Nazemzadeh and his co-conspirators that the package had been held by Dutch customs at the request of United States Customs. He provided a copy of an email from a Homeland Security Investigations officer requesting documents pertaining to the transaction. The UCA forwarded this email to Nazemzadeh as well as two HES employees. Nazemzadeh then encouraged the UCA not to disclose Nazemzadeh's involvement in the transaction, telling the UCA just to show the officers items tending to show the sale was only between Soundimaging and HES. Nazemzadeh suggested that the UCA could remove the Iranian names from the previous email correspondence.

Using information obtained in the email correspondence and recorded phone calls, Agent Sean Downey obtained a warrant to search email accounts belonging to Nazemzadeh, Hamayoun, and Hashemi. [Def. Ex. B.] On January 18, 2012, agents arrested Nazemzadeh at work. After his arrest, Homeland Security Investigations Agents Cole and Downey interrogated Nazemzadeh and he made inculpatory statements.

**II.      MOTION TO SUPPRESS EVIDENCE OR HOLD A FRANKS HEARING**

It is the Defendant's position that the search of his email account and those of his co-conspirators violated the Fourth Amendment and, as a result, all evidence obtained via the warrant to search these accounts must be suppressed.[2] Alternatively, Defendant seeks a *Franks* hearing regarding the accuracy and veracity of the affidavit submitted in support of the search warrant and the scope and execution of the warrant. He argues (1) the warrant was overbroad and failed to comply with Ninth Circuit case law regarding the scope and nature of searches of electronic data; (2) there is no indication the warrant was properly executed; and (3) the search warrant executed on Google and Yahoo was issued based on an affidavit containing material omissions and misrepresentations.

*1.    Scope of the Warrant*

Defendant makes a variety of arguments regarding the scope of the warrant: the warrant contains no search protocol and no specific word search is listed; the warrant allowed the Government to seize and keep the entire contents of Defendant's email account; the warrant permitted seizure of emails pre-dating the time-frame for which probable cause to believe any crime took place existed; the warrant did not comply with Ninth Circuit caselaw because it "did not limit the items to be searched or seized in any way - temporally or substantively . . . ;" the warrant didn't provide for segregation of data, review by an independent investigator not assigned to the case, and allows the Government to keep the data indefinitely. [Def.'s brief at 16-18].

Defendant's arguments are without merit and ignore unfavorable Ninth Circuit law. The Fourth Amendment requires that warrants be based upon probable cause and describe with particularity the things to be seized. U.S.Const. amend. IV. This is known as the "specificity" requirement and encompasses two aspects: particularity and breadth. *United States v. SDI Future Health, Inc.,* 568 F.3d 684, 701-02 (9th Cir. 2009) (quoting *In re Grand Jury Subpoenas Dated Dec. 10, 1987,* 926 F.2d 847, 856-57 (9th Cir. 1991)). Particularity is the requirement that the warrant must clearly state what is sought.

In determining whether a description is sufficiently precise, we have

---

[2] Defendant seeks suppression of the evidence seized from his co-conspirators accounts. However, he is only entitled to challenge the search of an area in which he has a reasonable and legitimate expectation of privacy. *See U.S. v. $40,955.00 in U.S. Currency,* 554 F.3d 752, 756 (9th Cir. 2009). Because Defendant could have no reasonable expectation of privacy in the email accounts of others, he cannot challenge the seizure of email accounts other than his own.

concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986) (internal citations omitted).

In addition to being sufficiently clear, a warrant must also be "legal, that is not overbroad." *SDI Future Health*, 568 F.2d at 702. "[T]his means that 'there [must] be probable cause to seize the particular thing[s] named in the warrant.'" *Id.* (quoting *In re Grand Jury Subpoenas,* 926 F.2d at 857). Therefore, "breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Id.* Probable cause means a fair probability, not certainty or even a preponderance of the evidence. *Id.* (internal citations and quotations omitted.).

> A.  <u>*The Warrant Appropriately Granted Permission to Seize Data and Limited Officers' Discretion as they Conducted the Offsite Search*</u>

Nazemzadeh argues the warrant was overbroad because it failed to set forth specific guidelines regarding the search protocol and allowed officers to seize "vast amounts" of data and keep it indefinitely. He claims that the warrant should have included a specific search methodology or listed a specific word search. Nazemzadeh's arguments are framed as breadth arguments. However, cases analyzing whether search protocols are required frame the question as one of particularity. *See, e.g., United States v. Adjani,* 452 F.3d 1140, 1147-50 (9th Cir. 2006) (discussing particularity in response to overbreadth argument).

The parties agree, and are correct, that *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982) as applied by *United States v. Comprehensive Drug Testing*, is the governing standard, 621 F.3d 1162 (9th Cir. 2010) (*en banc*) (*per curiam*) ("*CDT*") ("we have updated *Tamura* to apply to the daunting realities of electronic searches."). *Tamura,* provides when probable cause exists, "all items in a set of files may be inspected during a search, provided that sufficiently specific guidelines for identifying the documents sought are provided in the search warrant and are followed by the officers conducting the search. *Tamura*, at 595. It further provides, "[i]f the need for transporting the documents is known to the officers prior to the search, they may apply for specific authorization for large-scale removal of material, which should be granted by the magistrate issuing the warrant only where on-site sorting

is infeasible and no other practical alternative exists." *Id.* Even where documents not covered by the warrant are seized and retained by the government, suppression is not necessarily required. *See Tamura,* at 597.

Although evidence was suppressed in *CDT,* that case's application of *Tamura* does not mandate suppression here. *CDT* cautioned that "because over-seizing is an inherent part" of the process of searching electronic records, greater vigilance is called for on the part of judicial officers to strike the correct balance between the government's interest in law enforcement and the right to be free from unlawful searches. *CDT* at 1177. While compliance with Justice Kozinski's concurrence in *CDT* would provide a "safe harbor" for agents, it is not required, as Defendant asserts. *CDT*, at 1183 (Callahan, J., *dissenting*) ("The concurrence is not joined by a majority of the en banc panel and accordingly the suggested guidelines are not Ninth Circuit law.").

What happened in *CDT* was very different from the facts at hand as it "was an obvious case of deliberate overreaching by the government in an effort to seize data as to which it lacked probable cause." *CDT* 621 F.3d at 1172. Agents in *CDT* obtained a warrant authorizing three categories of business records. However, once agents arrived to execute the warrant, they realized it would take considerable time to separate the materials, so they seized all of the company's records, whether covered by the warrant or not. The intentional seizure of records officers knew was not covered by the warrant was in violation of the Fourth Amendment. Thus, the court cautioned, the "process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect." *Id.* at 1177.

First, agents properly sought, and the magistrate judge properly issued, a warrant authorizing seizure of Nazemzadeh's entire email account. A warrant authorizing blanket removal of all computer storage media for later examination must be premised upon an affidavit giving a reasonable explanation - informing the court of the practical limitations of conducting an onsite search - why a wholesale seizure is necessary. *United States v. Hill*, 459 F.3d 966, 975-76 (9th Cir. 2006). On-site review of electronic data presents the "serious risk that the police might damage the storage medium or compromise the integrity of the evidence by attempting to access the data at the scene." *Id.* It also imposes a significant and unjustified burden on police resources and causes disruption of the subject's

home or business for the entire time that the search continues. *Id.* Thus, removal of storage media on which evidence is likely to have been stored is appropriate because "if the search took hours or days, the intrusion would continue for that entire period, compromising the Fourth Amendment value of making police searches as brief and non-intrusive as possible." *See id.*

Similarly, Defendant's contention that a search protocol was required is contrary to the law in the Ninth Circuit. *Hill*, 459 F.3d at 978 ("There is no case law holding that an officer must justify the lack of a search protocol in order to support issuance of [a] warrant." "We look favorably upon the inclusion of a search protocol; but its absence is not fatal"). Even without a specific protocol, the underlying limitation of the Fourth Amendment is always reasonableness. *Id.* at 974. "Computer records are extremely susceptible to tampering, hiding, or destruction, whether deliberate or inadvertent." *Id.* at 978 (internal quotations omitted). They "are easy to disguise or rename, and were we to limit the warrant to such a specific search protocol, much evidence could escape discovery simply because of [Nazemzadeh's] labeling of the files documenting [his] criminal activity. The government should not be required to trust the suspect's self-labeling when executing a warrant." *Adjani,* 452 F.3d at 1150.

In this case, the affidavit supporting the warrant follows the advice of *Tamura* seeking "specific authorization for large-scale removal of material," and explaining why "on-site sorting is infeasible and no other practical alternative exists." Agent Downey presented an application to the magistrate judge supported by an affidavit which outlined "Procedures for Electronically- Stored Information." [Def.'s Ex. B, 11-13.] In this section of the affidavit, Agent Downey stated that federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation, but personnel of Internet Service Providers, Yahoo!, Inc. and Google, Inc. ("ISPs") are not; analysis of the data requires special technical skills and is time consuming; he also explained that a search and analysis by federal agents on the ISPs' premises would impractical and inappropriate, and cause a severe impact on their businesses. Thus, he requested authority to seize all content of the email accounts in the form of digital copies to be provided by the ISPs. These copies would then be forensically imaged and the image analyzed to identify communications and other data subject to seizure. At the evidentiary hearing, counsel for the

Government stated that an image of the data had been provided to the Defendant so that he could know exactly what files had been accessed and retained by the Government - a procedure approved in this Circuit. *See Hill,* 459 F.3d at 968 (adopting district court reasoning verbatim, *United States v. Hill,* 322 F.Supp 2d. 1081, 1091-92 (C.D. Cal. 2004)).

In addition to outlining the need for seizure of the entire email account and search protocols to be used, the application for the warrant specified that the search would be limited to:

> a. "communications and attachments related to the purchase, sale, shipment and/or transshipment of goods and services of U.S. origin or from the United States for or by "Mohammad Nazemzadeh," Nazemzadeh," . . . "Medi-Trade," "Hospital Equipment Services," "HES," and "Arpa Medical Company";
> b. Electronic mail and attachments related to the identities of any co-conspirators;
> c. Electronic mail and attachments referring or relating to any U.S. export laws, regulations, or controls;
> d. Electronic mail and attachments that provide context to any electronic mail reflecting the criminal activity described in this warrant including any electronic mail sent or receive in temporal proximity to any relevant electronic mail and any electronic mail that identifies any users of the subject account;
>
> [Def.'s Ex. B, Doc. 51-1, at 19.]

This language limits officers' discretion by specifying items (communications and attachments), within certain categories of documents that relate to the commission of a specific crime (purchase, sale, shipment/transshipment of goods in violation of United States export laws). The warrant does not authorize the search of family photos, personal letters, or other items not related to the export of goods to Iran. Therefore, the warrant describes the items to be searched and seized as particularly as could be reasonably expected given the nature of the crime and the evidence in the Government's possession at the time. *See United States v. Adjani*, 452 F.3d 1140, 1149 (9th Cir. 2006). The language also sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not as opposed to "authoriz[ing] wholesale seizures of entire categories of items not generally evidence of criminal activity." *Spilotro*, 800 F.2d at 963-64 (invalidating a warrant that simply authorized seizure of various records evidencing violations of multiple statutes listed without stating the precise identity, type, or contents of the records sought or doing anything to tie the documents sought to the crime alleged). Moreover, Defendant has not pointed to any email that is outside the scope of the warrant. Therefore, this Court declines to invalidate the warrant based on the lack of a specific search protocol or based on the offsite search.

///

**B.** *The Warrant's Authorization of Emails Predating 2010 did not Render it Overbroad*

Nazemzadeh contends the warrant was overbroad because it could have been limited to a specific date range, rather than allowing agents to search emails pre-dating 2010 when the alleged criminal activity commenced. However, officers are not required to narrow searches simply because they can do so. *See Adjani,* 452 F.3d 1140. "To require such a pinpointed computer search, restricting the search to an email program or to specific search terms, would likely have failed to cast a sufficiently wide net to capture the evidence sought." *Adjani,* 452 F.3d at 1149-50. Analogously, temporally restricting the search of Nazemzadeh's email account would likely also have failed to cast a sufficiently wide net. Moreover, probable cause existed in this case to search for instrumentalities of a conspiracy to export goods in violation of United States law. A conspiracy necessarily includes communication among its participants. This communication might take place via paper notes, phone calls, face-to-face conversations, or emails. *See id.* at 1146. Because Nazemzadeh's knowledge that his actions were in violation of export law is an element of the crime, to be proven at trial, evidence of that knowledge could be present in the form of emails communicating with co-conspirators or others which could have pre-dated 2010. The Court declines to invalidate the warrant on this basis.

**C.** *There is no Evidence the Warrant was Improperly Executed*

Defendant also argues the execution of the warrant was unreasonable because the Government has provided no evidence that it complied with the 90-day window provided in the warrant for searching the accounts. At the evidentiary hearing, counsel for the Government stated that an image of the data had been provided to the Defendant so that he could know exactly what files had been accessed and retained by the Government. The defense has provided no evidence that the search was unreasonable.

With respect to Defendant's contention that the Government should not be permitted to retain the master copy for authentication purposes, he is correct. The testimony of the agents who removed the documents from their master volumes should suffice for this purpose. *Tamura*, 694 F.2d at 597 (citing *United States v. Helberg*, 565 F.2d 993, 997 (8th Cir.1977)).

2.      _Omissions in the Affidavit/Franks Hearing_

Defendant seeks to suppress the fruits of the search warrant executed on his email account on the basis that there are material misrepresentations and omissions in the affidavit submitted to obtain the search warrant. In the alternative, Defendant seeks a _Franks_ hearing on the veracity of the affidavit supporting the warrant. Defendant asserts that Agent Downey improperly omitted all exculpatory statements, which could have led the magistrate judge to conclude that probable cause was lacking from his affidavit in support of the application for search warrant. Specifically, Defendant argues that the affidavit submitted in support of the search warrant was insufficient to support probable cause because it did not support a finding that Defendant "willingly" or "knowingly" sought to export goods in violation of the law. Defendant is incorrect. The affidavit supporting the warrant did not contain misleading false statements or omissions and the warrant was supported by probable cause because the affidavit submitted to the magistrate judge established that there [was] a "fair probability that contraband or evidence of a crime [would] be found in" Nazemzadeh's email account. _Gates_, at 238.

A.      _Defendant is not Entitled to a Franks Hearing_

There is a presumption of validity with respect to the affidavit supporting a search warrant. _Franks v. Delaware_, 438 U.S. 154, 171 (1978). A defendant is entitled to a _Franks_ hearing only if he makes "a substantial preliminary showing that the affidavit contained intentionally or recklessly false statements or omissions, and that the affidavit without the misleading statements or omissions would not be sufficient to support a finding of probable cause." _United States v. Bennett_, 219 F.3d 1117, 1124 (9th Cir. 2000). The effect of misrepresentations or omissions is considered cumulatively. _United States v. Stanert_, 762 F.2d 775, 780-81 (9th Cir. 1985) (internal quotations and citations omitted). (citing _United States v. Esparza_, 546 F.2d 841, 844 (9th Cir. 1976)). "The government need not include all of the information in its possession to obtain a search warrant. An affidavit need only show facts adequate to support a finding of probable cause." _United States v. Johns,_ 948 F.2d 599, 606 (9th Cir. 1991) (citing _United States v. Ellison_, 793 F.2d 942, 947 (8th Cir.), _cert. denied_, 479 U.S. 937 (1986)). "The omission of facts rises to the level of misrepresentation only if the omitted facts 'cast doubt on the existence of probable cause.'" _Id._

"In order to avoid creating a rule which would make evidentiary hearings into an affiant's veracity commonplace, obtainable on a bare allegation of bad faith, a defendant's allegations of intentional or recklessly false statements or omissions cannot be merely conclusory; rather, they must be accompanied by a detailed offer of proof." *United States v. Chesher,* 678 F.2d 1353, 1360 (9th Cir. 1982). "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.* (citing *Franks,* 438 U.S. at 171). Moreover, "[w]e must 'give due weight to inferences drawn from [the] facts by resident judges and local law enforcement officers.'" *United States v. Payton*, 573 F.3d 859, 861 (9th Cir. 2009) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

If, at a *Franks*, hearing the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. *Franks,* 438 U.S. at 154-55.

Nazemzadeh contests two specific statements in the affidavit. He first points to the statement "Nazemzadeh's emails suggested that he knew it was illegal to export U.S. goods to Iran without a license and that he was working with coconspirators to conceal the goods' Iranian end user(s)." According to Defendant, this claim would have been undercut if the Agent had also informed the magistrate judge that Nazemzadeh originally openly inquired about shipping medical items directly to Iran. Second, Defendant argues the statement, "he knew there was an embargo against Iran and that a license is required from the U.S. treasury Department's Office of Foreign Asset Control (OFAC) to lawfully export items to Iran" was misleading because the Agent failed to tell the magistrate judge that Nazemzadeh told the UCA in a phone call that he did not believe healthcare items were on the sanctions list.

Nazemzadeh submits the omission of two exculpatory statements he made in an email to the UCA.[3] First, "we do not do anything against U.S. regulations at all . . . The only problem is its

---

[3] In addition, he argues that the magistrate judge should also have been informed that the communications were in Nazemzadeh's second language, and that his communications "evince confusion about the lawfulness of his conduct." However, given that he, by his own description, is doing Ph.D. level research and presenting his work at conferences in the United States, we do not find this omission reckless or misleading. The ability to function at that level indicates a high degree of competence in English.

shipment to Iran that no shipping company in the U.S. intends to ship the goods to Iran because of the insurance problem." And next, "I emphasis again, that we are not doing anything against U.S. foreign policies at all." [Def.'s Ex. C, Doc 51-1, at 27.]

According to Defendant, the Agent "presented a skewed and misleading portrait of events to the magistrate judge" who could have reached a different conclusion had he been informed of the full picture. [Def.'s brief, Doc. 51, at 21.] Thus, he states, he has met his burden under *Franks* making a substantial preliminary showing because the Agent knew of the exculpatory statements based on the ROI and omitted them.

Defendant has not made the required preliminary showing. Rather than "pointing out specifically with supporting reasons the portion of the affidavit" that he claims is misleading, *Franks* at 154, he parsed his many communications with the UCA and cherry picked the few phrases which, taken out of context, appear to be exculpatory. Once the offered statements are read in the context of the remaining communications, it becomes clear that Defendant failed to show that the omissions and alleged misstatements were either misleading or intentional or reckless.

For starters, Defendant's contention that the Agent omitted the fact that he was openly seeking to export items to Iran is baseless. The agent wrote, "On or about August 16 and 17, 2011, Nazemzadeh indicated that: (a) he was purchasing the MRI coils for use in, and export to, Iran and used HES BV to transship the goods from the U.S. to Iran;" [Def.'s Ex. B, Doc. 51-1 at 10.]

Next, the supposedly exculpatory phrase Nazemzadeh complains was omitted, "we do not do anything against U.S. regulations at all . . . The only problem is its shipment to Iran that no shipping company in the U.S. intends to ship the goods to Iran because of the insurance problem," actually reads as follows:

> We both know that we do not do anything against U.S. regulations at all . . . The only problem is its shipment to Iran that no shipping company in the U.S. intends to ship the goods to Iran because of the insurance problem. The HES company is working with a lot of companies all over the world. We have worked with them for ages. They have purchased a lot of thing from the U.S. which might or might be ended up to Europe, Iran, or anywhere. Everything is legal and the purchase will be made by HES and the money will be transferred from HES company to your bank account. You will also offer the warranty to HES. You do not have anything to do with any company in Iran or anywhere. I emphasis again that we are not doing anything against U.S. foreign policies at all.

[Def.'s Ex. C, at 23.]

2    The above quoted email was in response to an email from the UCA to Nazemzadeh in which

3    the UCA stated it was illegal even for a company in the Netherlands to send the coil to Iran and

4    expressed his concerns that it could come back and cause problems. Thus, once the purportedly

5    exculpatory statement is read in context, it is reasonable to infer Defendant had the intent to conceal

6    the Iranian end-users from third parties by routing payment though HES and assuring that Company

7    A would offer the warranty to HES.

8    Next, the contested phrase "he knew there was an embargo against Iran and that a license is

9    required from the U.S. treasury Department's Office of Foreign Asset Control (OFAC) to lawfully

10    export items to Iran" is not misleading. Even if the agent had informed the magistrate judge that

11    Nazemzadeh told the UCA in a phone call that he did not believe healthcare items were on the

12    sanctions list, it would not have undercut probable cause. This statement was part of a phone call

13    between the UCA and Nazemzadeh that took place on August 16, 2011. During the call, the UCA,

14    posing as a salesperson for Soundimaging, explained to Nazemzadeh that he believed the United

15    States government did permit medical equipment to be shipped to Iran for humanitarian purposes but

16    there was a licensing process to follow through the US Treasury Department. Nazemzadeh responded

17    that he would rather do so later, and that it was easier to ship via the Netherlands. And went on to say

18    that they had to pay the Netherlands company "a lot" to do the shipping.

19    The UCA informed Nazemzadeh that, even if the equipment were shipped to Iran via the

20    Netherlands, it would still need a license. Nazemzadeh responded that the purchase would actually

21    be made by HES, which sometimes kept the equipment, sometimes forwarded to Europe, Iran, or

22    elsewhere. Therefore, they need not worry about the transaction, because the purchase would be a

23    legal one. The UCA clarified that the embargo was in place and told Nazemzadeh that the choice was

24    his whether or not to obtain the license.

25    Nazemzadeh then went on to discuss his awareness that sanctions existed, but then said it

26    shouldn't be a problem because they were dealing in medical equipment. Companies charge for

27    dealing with Iran, he said, because they are afraid of the sanctions even though it is for medical

28    equipment. He then stated that the decision whether to apply for the license through "OFAC" or to

save time by shipping via the Netherlands was up to the UCA. Before the UCA replied, Nazemzadeh continued, discussing his knowledge regarding the number and costs of licenses that had been obtained by GE (evidently he had either worked with GE in the past or had contacts there). Ultimately, he declined to get the license and stated he would prefer to transship though the Netherlands. Parts of this exchange were mirrored in emails between the UCA and Nazemzadeh. In addition, earlier in the same call between Nazemzadeh and the UCA on August 16, 2011, the UCA brought up the fact that Nazemzadeh's prior purchase inquiry had been for transhipment to Iran through a company called TNT. Nazemzadeh immediately responded that he didn't want it for Iran, and that "it would be safer for both sides" to ship though HES Company in the Netherlands. Then, in another call the following day, the UCA discussed his fears that if there were any warranty issue, the brain coil could be shipped back and his name would be associated with the transshipment to Iran causing him to get into trouble. Nazemzadeh reassured him that his name would be removed from any paperwork by HES, thereby protecting the UCA from association with Iran. At the evidentiary hearing, Nazemzadeh averred that he only sought to distance himself from the transaction because he was afraid that it would cause him to lose his Visa. This argument is belied by a statement he made in a call with the UCA in which he said, "HES would act wisely because they're in trouble too against U.S. sanctions."

Taking into account the entire exchange between Nazemzadeh and the UCA, the Court does not find that the disputed statement was misleading. Even purged of the supposedly misleading statements, the Affidavit specifies that Nazemzadeh intended to purchase goods for use in Iran; that he intended to transship the goods using a company in the Netherlands, which would pay for the goods directly; that the UCA would not get into trouble because HES would be listed as the end-user; an employee of HES cc'd Hashemi in an email to the UCA containing a copy of the wire transfer showing payment for the coil; and finally that Nazemzadeh sought to distance himself from the transaction after the coil was held by customs by encouraging the UCA to tell HSI that the transaction was only between Company A and HES and only to show emails tending to show the same. [Def.'s Ex. B, Doc 51-1, at 13.] Thus, there were numerous bases upon which the magistrate judge could reasonably infer that there was a fair probability evidence of a crime would be found in the place to

be searched. *See Illinois v. Gates*, 462 U.S. 213, 240 (1983).

### i.     *Probable Cause did not Require Evidence of Scienter*

Probable cause for a search warrant means a fair probability that contraband or evidence of a crime will be found in a particular place based on the totality of the circumstances. *SDI Future Health,* 568 F.3d at 703; *Gates*, 462 U.S. at 235  ("[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.").  A magistrate need not be certain that the items will be found on the premises, a fair probability is sufficient. *United States v. Rabe*, 848 F.2d 994, 997 (9th Cir. 1988).  At the evidentiary hearing, Defendant argued that probable cause in his case required that officers provide the magistrate judge with evidence that he knew he was violating United States export laws when he sought to purchase the MRI coils for shipment to Iran. Defendant would be correct were he contesting an arrest warrant. In that context, when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred. *Rodis v. City, County of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009) (quoting *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994)). However, Defendant has not cited, nor has the Court found, a case supporting such a heightened standard in the context of a search warrant.

Defendant relies on *Chism v. Washington State*, 661 F.3d 380 (9th Cir. 2011), and *United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006) to support his argument that probable cause in the search warrant context requires evidence of a suspect's knowledge that his or her actions were illegal when a search is part of an investigation of a specific intent crime. Defendant reads these cases incorrectly.  In *Chism*, the officer sought a warrant to search Chism's computer for evidence of child pornography but omitted significant information that would have led to someone other than Mr. Chism. The fact that the omitted evidence all led to someone other than the accused meant that it was appropriate for the court to focus on whether there was probable cause to believe Mr. Chism had committed a crime.  In the absence of any evidence he had accessed illegal images, there was no basis for a judge to find a fair probability that evidence of a crime would be found in the location to be searched -  his computer. Thus, the court held (in a civil rights case brought by Chism following the

illegal search), that the framework used in *Gourde* to determine whether an affidavit purged of materially false statements or omissions would have supported probable cause was the appropriate standard by which to evaluate the circumstances before it. *Chism*, at 389. What the court did not do however, was update the "fair probability" standard. Indeed, the Chism court indicated it that intended to follow the probable cause standard which has been in place for 30 years when it cited *Illinois v. Gates,* 462 U.S. 213 (1983), identified in *Gourde* as the "landmark" case defining probable cause.

The *Gourde* standard applied by the *Chism* court, is as follows: "three key pieces of evidence, considered together, were sufficient to establish probable cause to believe Gourde's computer contained images of child pornography: (1) that the accessed website 'was a child pornography site whose primary content was in the form of images'; (2) that as a subscriber to the website, "Gourde had access and wanted access to these illegal images"; and (3) that "[h]aving paid for multi-month access to a child pornography site," and owing to the "long memory of computers," Gourde's computer was likely to contain evidence of a crime. *Chism,* (citing *Gourde* at 1070-71). Those three pieces of evidence "easily [met] the 'fair probability test.'" *Id.* In other words, the court in *Gourde* found the several intentional acts required to join a website purveying child pornography and maintain the membership for several months bolstered the inference that evidence of a crime would be found in the location to be searched. This was evidence that the defendant had accessed and possessed child pornography, not that he knowingly accessed the images. *Gourde*, at 1071 n.4.

Both *Chism* and *Gourde* involved prosecutions for possession of child pornography and neither court made a showing of intent a prerequisite to their finding of probable cause. Without some evidence that the accused had accessed any images from the websites on which they were located, there could be no possession, therefore the courts relied on intentional acts taken (or not taken) by the accused persons to determine whether there was probable cause to believe possession of illegal images had taken place. *See Gates*, 462 U.S. at 232 ("probable cause is a fluid concept- turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules.") To extend this reasoning in the absence of any explicit (or even implied) ruling in this Circuit and create a rule that no search warrant can issue for crimes with a specific intent element unless probable cause supported such intent would be a far reach, and we decline to do so.

III.    MOTION TO SUPPRESS STATEMENTS

Defendant moves to suppress his post-arrest statements to Agents Cole and Downey on January 12, 2012, on two grounds. First, he contends his statements were obtained in violation of his Fifth Amendment rights because his waiver of *Miranda* rights was rendered invalid by an inadequate *Miranda* advisal. Second, he contends his statements were involuntary because the statements he required an interpreter but none was provided. At the evidentiary hearing, he also argued that he invoked his right to an attorney during questioning, but Agents disregarded his request and continued the interview.

*1.    The Miranda Warnings and Waiver Were Valid*

According to Defendant, his waiver of *Miranda* rights was invalid because the *Miranda* warnings provided by Agents Cole and Downey were ambiguous with respect to Defendant's right to have an attorney present during questioning, and therefore, inadequate. In Defendant's view, Agents nullified the meaning of the *Miranda* advisals when they told him that an attorney would only be available at a later time but they wished to question him right away. Defendant contends he perceived this statement as an inability to have an attorney with him during the interrogation.

In order for a defendant's statements to be admissible, he or she must first be properly advised of his or her rights to remain silent and to have counsel present. *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (citing *Miranda v. Arizona*, 384 U.S. 436, 468–470 (1966)). A valid *Miranda* warning must convey clearly to the arrested party that he or she possesses the right to have an attorney present prior to and during questioning. *United States v. San Juan-Cruz,* 314 F.3d 384, 388 (9th Cir. 2002) (citing *United States v. Connell*, 869 F.2d 1349, 1353 (9th Cir. 1989)). The warning also must make clear that if the arrested party would like to retain an attorney but cannot afford one, the Government is obligated to appoint an attorney for free. *Id.* The warning must be clear and not susceptible to equivocation; the combination or wording of its warnings cannot be affirmatively misleading. *Id.* When two differing sets of warnings are given the officer can rectify the situation by clarifying the statements. *Id.*

A defendant may then waive his or her *Miranda* rights provided the waiver is made voluntarily, knowingly and intelligently. *Id.* In order to be knowing and intelligent, "the waiver must

have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 421. There is a presumption against waiver and the Government bears the burden of establishing the existence of a valid waiver of *Miranda* rights. *North Carolina v. Butler*, 441 U.S. 369, 374–75 (1979). The validity of a waiver depends upon the particular facts and circumstances of the case, including the background, experience and conduct of the defendant. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). "Several factors to consider are (i) defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system." *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007).

In a case involving a foreign national, the court should assess voluntariness by examining, among other things, whether the defendant signed a written waiver; whether the advice of rights was in the defendant's native language; whether the defendant appeared to understand those rights; whether the defendant had the assistance of a translator; whether the defendant's rights were explained painstakingly; and whether the defendant had experience with the American criminal justice system. *United States v. Amano,* 229 F.3d 801, 804 -805 (9th Cir. 2000) (citing *United States v. Garibay*, 143 F.3d 534, 538 (9th Cir.1998)). The court in all cases must examine the totality of the circumstances. *Id.* at 536–37.

Considering the factors outlined in *Crews*, Defendant's waiver was valid. Weighing in favor of Nazemzadeh are the facts that he did not have prior experience with the justice system and was not advised in his native tongue. Indeed he initially did seem to be confused about his ability to have an attorney present given that he was not warned of his impending arrest ahead of time. Weighing against him, however are the remaining factors. Nazemzadeh signed a written waiver. He has an exceptional mental capacity in that he possesses a doctorate and earns his living conducting research in medical techniques in the United States. He publishes articles in scientific journals, and presents his work at conferences in the United States. Defendant has not averred that his presentations or publications were in any language other than English or that he conducts his day-to-day work in a

language other than English. Thus, the foregoing are all factors indicating that he has an ability to communicate in English at a very sophisticated level negating the need for a translator. Though he explains that his verbal English skills are poor, Defendant also acknowledged in his declaration that he has studied written English since middle school. Custodial interrogation is in inherently stressful situation in which one's language skills may temporarily diminish. However, Nazemzadeh twice affirmed his ability to communicate and ultimately appeared to understand his rights. He then opted to sign the written waiver. As agents advised Nazemzadeh, they repeated his rights several times, clarifying their meaning as follows.

After questioning Nazemzadeh concerning basic biographical information Agents Sean Downey ("SD") and David Cole ("DC") engaged in this exchange with Nazemzadeh:

DC:     Ok, so now, Mohammad, before we get into telling you all about the investigation and you answering our questions, we wanna go over your rights. I'm sure you know in the United States, whether a U.S. citizen or not, you have certain rights. So like I said, Sean and I both would like to talk to you, before we do that , we need to make sure we could talk to you, but not about the case, until you make it clear to us that you wanna talk to us, so listen to Sean, he's gonna read this to you, if you have any questions, then you let us know and we could try and explain it to you. Alright?

SD/MN: Ok.

SD:     Before we ask you any questions, it is my duty to advise you of your rights. You have the right to remain silent, anything you say can be used against you in a court or other proceedings. You have the right to consult an attorney before speaking or answering questions. You have the right to have an attorney present with you during questioning. If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish. If you decide to answer questions, you still have the right to stop the questioning at anytime to stop the questioning for the purpose of consulting with an attorney. Does that make sense in English? Do you need anything?

MN:     Yes. I'm not that bad, I can understand.

DC & SD:  No, no, no . . . I know, but I need to ask.

DC:     The important part is, what me mean is this, like no matter what, you always have the right to an attorney. But what we mean is, one is not going to pop out of the ceiling right now. So if you wanna talk to us right now, it's just gonna be the three of us. You have the right to stop anytime and talk to an attorney, etcetera, but what this is for, basically, is we would like to talk to you right now, and it's just gonna be Sean, you and me. It's up to you, ok?

MN:     Ok, but it would be (undecipherable) over, you didn't let me know before my arrest here.

DC:     Explain it to me again, sorry?

MN:     I mean, you didn't let me hire an attorney for my case, so why didn't you let me know?

| | | |
|---|---|---|
| 1 | DC: | No, no, let me explain it to you. In the U.S., this is how it works, we don't tell people ahead of time, "hey we're gonna come and arrest you. That is not how we do them. It doesn't work that way. |
| 2 | MN: | I'm asking about the arrest. It's a very bad feeling for me. |
| 3 | DC: | About what? |
| 4 | MN: | The arrest |
| 5 | DC: | Oh the arrest! |
| 6 | MN: | I lost my self confidence. |
|   | DC: | I understand, getting arrested is never a good feeling, I assume, for anybody. I don't know how else we could do it to where it doesn't feel bad. It's not a good feeling and we gotta get over the fact you're upset about getting arrested or lost your self-confidence. But the important part for us now is to talk about what we could do and why we're here. |

1   DC: No, no, let me explain it to you. In the U.S., this is how it works, we don't tell
2   people ahead of time, "hey we're gonna come and arrest you. That is not how
    we do them. It doesn't work that way.
3   MN: I'm asking about the arrest. It's a very bad feeling for me.
    DC: About what?
4   MN: The arrest
5   DC: Oh the arrest!
    MN: I lost my self confidence.
6   DC: I understand, getting arrested is never a good feeling, I assume, for anybody.
7   I don't know how else we could do it to where it doesn't feel bad. It's not a
    good feeling and we gotta get over the fact you're upset about getting arrested
8   or lost your self-confidence. But the important part for us now is to talk about
    what we could do and why we're here.
9   MN: But whoever is going to talk to him, about any regards.
10  SD & DC: Who?
    MN: All over the country so you first arrest him? After that, you ask your questions?
11  Is that what you do?
12  DC: Yes, in the United States, what we do is we investigate a matter, ok? We work
    with an attorney, a prosecutor, ok? We take the evidence to a judge, if the
13  judge decides there's enough evidence called probable cause, to think that the
    person is involved in the crime that we think they're involved in, then the judge
14  signs the warrant to arrest them. Then after we arrest you, we talk to you. We
    can't go to you before the arrest, because then it becomes more difficult. It
15  doesn't work that way, people could destroy evidence, they could leave, they
    could hide, that's just not how we do things. So it's up to you, you need to tell
16  us.
    MN: Ok, so before letting you know that I'm gonna hire an attorney. Ok, first you're
17  gonna tell me the details of the case? Ok, first I can hear, and then I can decide
    if I want to . . .
18  SD: I just want to say you can start to talk and at anytime after we talk, you can say,
    I want an attorney . . .
19  DC: But you have to make it clear, here's what you need to understand,
20  Mohammad, we can talk and have an interview or no. It's up to you. It's
    completely up to you. But you need to make a clear determination that you
21  want to talk to us right now or not.
    MN: Ok, after hearing you.
22  DC: After hearing us, that's fine. Just first decide if you wanna sign this or not. It's
23  up to you. You can sign it and not talk to us. But before we start talking . . .
    MN: No, I wanna hear what I'm accused of . . .
24  DC: Ok, ok, well then we're not gonna talk, that's what we're trying to say. It's up
    to you. Ok, I hope you understand me.
25  MN: Ok, first I should know what, what . . .
26  DC: Ok, then I'll explain it to you as completely and easily as I can. . . .
27
    Agent Cole then proceeded to explain the charges to Nazemzadeh.
28

| | |
|---|---|
| MN: | And if I don't sign it? |
| DC: | And if you don't sign it, you can talk later when you get a lawyer and you see the judge, and we could do this all later. It's completely up to you. I can't tell you what to do. I can tell you that Sean and I would like to talk to you today and start moving forward with whatever information you have. Because the information that you have will become less valuable after people find out that you got arrested. And the people that we're interested in, if they find out that you got arrested, it's up to you. Read this part right here. |
| SD: | Where it starts right here is: I have read the above statement of my rights read and explained to me, and I fully understand these rights. I waive them freely and voluntarily, without threats or intimidation, and without promise of any reward or immunity. I was taken into custody at . . . If I could have you print your name here, and then sign. And my partner and I will sign here as witnesses. Let me double check, I've read these rights to you, I've put a line here, can you initial next to each one to show that you understand each one, I can read . . . |
| MN: | Whenever I want to stop, I can? |
| DC & SC: | Yes! |
| SD: | Let me have you initial beneath the bottom one, I'll read it again: If you decide to answer questions now, which you are, you still have the right to stop the questions at any stop or to stop the questions to consult with an attorney. So at any time you want . . . |
| DC: | So at any time Mohammad, that you don't like what's going on, how we're treating you or what's happening, then we'll just be done. |
| MN: | Can anyone help me in translating things? |
| DC: | In translating things? We don't have a translator right now. So if you don't feel like you can communicate in English . . . |
| MN: | No, I can communicate, but go ahead. |

[Def.'s Ex. D at 36-40.]

The above exchange demonstrates that, although Nazemzadeh may have initially been confused about his ability to consult an attorney, he ultimately felt able to proceed without an interpreter present and chose to sign the written *Miranda* waiver.[4] Twice during the exchange, Nazemzadeh assured the officers he could communicate. Officer Downey specifically asked Nazemzadeh, "Does that make sense in English? Do you need anything?" To which, Nazemzadeh responded, "Yes, I'm not that bad, I can understand." [Def.'s Ex. D, at 37.] Later during the exchange Nazemzadeh asked, "Can anyone help me in translating things?" [*Id.* at 40.] Agent Cole replied, "In

---

[4] In Defendant's declaration, submitted with his brief, he indicates that he has only began speaking English since he moved to the United States in 2009. He also stated, however, that he has studied English reading and spelling since middle school.

translating things? We don't have a translator right now. So if you don't feel like you can communicate in English . . . ." [*Id.*] Nazemzadeh reassured, "No, I can communicate, but go ahead." [*Id.*] Indeed, after confirming that he could communicate, Nazemzadeh said, "I have lots of things to do today," indicating his haste to proceed.

Similarly, his arguments that Agents Downey and Cole refused to provide an attorney immediately (i.e. "one is not going to pop out of the ceiling right now") are without merit. A finding of involuntariness is predicated on police overreaching or coercion. *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) ( Police overreaching such as intimidation, coercion, or deception is a necessary predicate to finding a *Miranda* waiver involuntary.); *See also United States v. Gamez,* 301 F.3d 1138, 1144 (9th Cir. 2002) (finding officer's comment that it would "behoove" the defendant to disclose what he knew about the crime and that this was his "last chance" to come forward did not amount to coercion) (citing *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991)) (defining a coerced confession as one made under actual violence or "a credible threat of physical violence"). Agents Downey and Cole were polite and patient during the entire interview. They encouraged Nazemzadeh to talk to them but continually assured him that he was not required to do so. They repeatedly told Nazemzadeh, "the choice is yours." There is simply no evidence that Downey or Cole coerced Defendant in to participating in the interview. Rather, the transcript of Defendant's interview is credible evidence that his waiver was entirely voluntary and that Defendant made choice to proceed without a translator or attorney rather than wait until later when one would be provided.

### 2.    *Nazemzadeh Did Not Unequivocally Invoke his Right to Counsel*

Nazemzadeh also contends that Agents Cole and Downey continued to question him even after he invoked his right to an attorney. A suspect who invokes the right to counsel cannot be questioned unless an attorney is present or the suspect reinitiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). To invoke the right to counsel, a defendant must make an "unambiguous" request for counsel. *Davis v. United States,* 512 U.S. 452 (1994). If the defendant makes an ambiguous or equivocal statement, police are not required to end the interrogation or ask questions to clarify the defendant's intent. *Berghuis v. Thompkins,* ___ U.S. ____, 130 S.Ct. 2250, 2253 (2010) (citing *Davis,*

512 U.S. at 461-62). Statements such as "maybe I should talk to a lawyer," *Davis,* at 462, or "I think I would like to talk to a lawyer," *United States v. Younger,* 398 F.3d 1179, 1187-88 (9th Cir. 2005), have been held ambiguous and not requests for counsel. In contrast, the questions "[c]an I get an attorney right now?;" "[y]ou can have an attorney right now?;" and "[w]ell, like right now you got one?" taken together, did constitute an unambiguous request for an attorney. *Younger*, 398 F.3d at 1187 (citing *Alvarez v. Gomez,* 185 F.3d 995, 998 (9th Cir. 1999)).

Defendant points to the italicized portions of the following exchange as invocations of his right to an attorney:

> DC: Well, before we get into the details, let's go over the paperwork first. And then we'll get into that. I'll explain that out to you perfectly. Ok? I'll explain it all to you. So as far as what's first, how about we go step by step. And then we'll go from there and make it easier for us, for you, for anyone else. Ok?
>
> MN: I have a question.
>
> DC: Yes? Go ahead.
>
> MN: So in my case, I'm actually worried about myself and what I've done, I'm convinced myself I haven't done anything wrong, so. *But for the other case, is it ok with you to have attorney to get attorney to . . .*
>
> DC: I'm not sure I understand you, we're not gonna get into that. What do you mean, your case and the other case?
>
> MN: I mean if somebody suspect something, if they act without letting him know what he's accused of-
>
> DC: No, no, we'll tell you right now everything that we think you've done.
>
> [Def.'s Ex. D, at 33.]

Agents Downey and Cole then took Nazemzadeh's biographical information and read Nazemzadeh his *Miranda* rights, confirming, "Does that make sense in English, do you need anything?" Nazemzadeh confirmed his ability to understand and Cole continued:

> DC: The important part is, what we mean is this, like no matter what, *you always have the right to an attorney. But what we mean is, one is not going to pop out of the ceiling right now.* So if you wanna talk to us right now, it's just gonna be the three of us. You have the right to stop anytime and talk to an attorney, etcetera, but what this is for, basically, is we would like to talk to you right now, and it's just gonna be Sean, you and me. It's up to you, ok?
>
> MN: Ok, but would it be (undecipherable) over, you didn't let me know before my arrest here.

| | | |
|---|---|---|
| DC: | Explain it to me again, sorry? |
| MN: | *I mean, you didn't let me hire an attorney for my case, so why didn't you let me know?* |
| DC: | No, no, let me explain it to you. In the U.S., this is how it works, we don't tell people ahead of time, Hey we're gonna come and arrest you. That is not how we do them. It doesn't work that way. |
| MN: | I'm asking about the arrest. It's a very bad feeling for me. |
| DC: | About what? |
| MN: | The arrest. |
| DC: | Oh the arrest! |
| MN: | I lost my self-confidence. |
| DC: | I understand, getting arrested is never a good feeling, I assume, for anybody. I don't know how else we could do it where it doesn't feel bad. It's not a good feeling and we gotta get over the fact that you're upset about getting arrested or lost your self-confidence. But the important part for us not is to talk about what we could do and why we're here. |
| MN: | But whoever is going to talk to him, about any regards. |
| DC & SD: | To who? |
| MN: | All over the country so you first arrest him? After that, you ask your questions? Is that what you do? |
| DC: | Yes, in the United States, what we do is investigate a matter, ok? We work with an attorney, a prosecutor, ok? We take the evidence to a judge, if the judge decides there's enough evidence called probable cause, to think that the person is involved in the crime that we think they're involved in, then the judge signs the warrant to arrest them. Then after we arrest you, we talk to you. We can't go to you before the arrest, because then it becomes more difficult. It doesn't work that way, people could destroy evidence, they could leave, they could hide, that's just now how we do things. So it's up to you, you need to tell us. |
| MN: | *Ok, so before letting you know that I'm gonna hire an attorney. Ok, first, you're gonna tell me the details of the case?* Ok, first I can hear, and then I can decide if I want to . . . |
| SD: | I just want to say you can start to talk and at any time after we talk, you can say, I want an attorney . . |
| DC: | But you have to make it clear, here's what you need to understand, Mohammad, we can talk and have an interview or not. It's up to you. It's completely up to you. But you need to make a clear determination that you want to talk to us right now or not. |
| MN: | Ok, after hearing you. |
| DC: | After hearing us, that's fine. Just first decide if you wanna sign this or not. It's up to you. You can sign it and talk to us. But before we start talking. . . |
| MN: | No, I wanna hear about what I'm accused of . . . |

- 24 -

DC:     Ok, ok, well then we're not gonna talk, that's what we're trying to say. It's up to you. Ok, I hope you understand me.

MN:     Ok, first I should know what, what . . .

DC:     Ok, then I'll explain it to you as completely and easily as I can. For purchasing, this is what we believe, this is what Sean and I believe, we feel very confident, we have a lot of evidence that you have purchased numerous items, mostly medical equipment for people in Iran.

[Def.'s Ex. D. at 37-39 (emphasis added)].

Agent Cole continued to explain the evidence to Nazemzadeh, who then asked, "And if I don't sign it?" Agent Cole replied that if Nazemzadeh opted not to sign the waiver, then he could talk later on after getting a lawyer. Cole also explained again that he and Agent Downey preferred to talk to Nazemzadeh right away and that any information he possessed would be less valuable after others learned of the arrest. Downey then re-read the waiver form to Nazemzadeh. Nazemzadeh, asked, "Whenever I want to stop, I can?" The agents affirmed that he could. Nazemzadeh then chose to sign the written waiver and proceeded with the interview.

It appears that Nazemzadeh initially had some difficulty understanding his right to an attorney and believed that he should have been informed prior to the arrest so that he would have the time to hire representation. However, after further explanation, Nazemzadeh told the Agents, "Ok, so before letting you know that I'm gonna hire an attorney. Ok, first, you're gonna tell me the details of the case? Ok, first I can hear, and then I can decide if I want to . . ." Agents Cole and Downey then repeatedly explained to Nazemzadeh that he had to clearly tell him whether he wished to proceed. However, even after confirming that he was allowed to stop the questioning at any time, Nazemzadeh opted to first hear the charges and then decide. His statement that he planned to hire an attorney is analogous to statements like "maybe I should talk to a lawyer" or "I think I would like to talk to a lawyer," held in *Davis* to be equivocal and inadequate to require cessation of questioning. Despite being told that he had to make his decision clear, he never said, "I want to stop" or "I want an attorney." After hearing the charges he signed the waiver and continued to answer the Agents' questions. Taking into account the entire exchange between Nazemzadeh and the Agents, the Court concludes that Nazemzadeh did not make anything close to an "unambiguous" request for counsel as required under *Davis*, and thus did

not invoke his right to an attorney.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court finds the Warrant for the search of Nazemzadeh's email account is valid and Defendant has not made the requisite showing entitling him to a *Franks* hearing. Therefore, Defendant's Motion to Suppress Evidence is DENIED. The Court finds the Government has met its burden to demonstrate Defendant's waiver of his *Miranda* rights was valid. Accordingly, Defendant's Motion to Suppress Statements is DENIED. The Court finds it is improper for the Government to retain the data seized from the Defendant's email account solely for authentication purposes. Therefore, to the extent that the Government is retaining the data for this purpose, the Court Orders it be returned. However, if the Government has a legitimate reason to retain the data, it may file a brief informing the Court of the reasons why it must retain the data.

IT IS SO ORDERED.


DATED:  February 11, 2013

_____
M. James Lorenz
United States District Court Judge